UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **BRENDA LEAR SCHEIDLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:14-cv-0937-WTL-DML** |
| | ) | |
| **STATE OF INDIANA and** | ) | |
| **STEPHEN W. ROBERTSON,** | ) | |
| **Commissioner, Indiana Department of** | ) | |
| **Insurance, in his official and personal** | ) | |
| **capacities,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendants' motion for summary judgment (Dkt.

No. 34). This motion is fully briefed, and the Court, being duly advised, **GRANTS IN PART**

**AND DENIES IN PART** the motion for the reasons, and to the extent, set forth below.

## I.     STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the

admissible evidence presented by the non-moving party must be believed, and all reasonable

inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476

F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view

the record in the light most favorable to the nonmoving party and draw all reasonable inferences

in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue

may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

1

that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490.

Finally, the non-moving party bears the burden of specifically identifying the relevant evidence

of record, and "the court is not required to scour the record in search of evidence to defeat a

motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II.   <u>BACKGROUND</u>

The facts that follow are taken in the light most favorable to the Plaintiff, Brenda Lear

Scheidler.[1]  Additional relevant facts are included in the Discussion section below.

Scheidler began working as a file clerk for the Indiana Department of Insurance ("IDOI")

in February 2006.[2] Compl. ¶ 7.  Her work product was overseen by Annette Gunter, and she was

supervised by Cindy Donovan, as was Gunter.[3]  Scheidler received promotions to higher ranks

within the clerical assistant role.  Dkt. No. 50-8 at 12-13.  For the duration of her employment

with IDOI, Scheidler's performance evaluations indicated that she was meeting, and in some

instances, exceeding, almost all of IDOI's expectations.  *See* Dkt. No. 50-1.

---

[1]  Many of the "facts" contained in the Plaintiff's Factual Background and Statement of Material Facts in Dispute section are not supported by the evidence of record.  The facts set forth herein are those that are supported by the record.  Moreover, Scheidler relies, in part, on findings of fact and conclusions of law from Scheidler's case before the State Employees' Appeal Commission ("SEAC").  *See, e.g.*, Dkt. No. 49 at 1-6 (citing Dkt. Nos. 50-9; 50-10).  The SEAC findings of fact and conclusions of law, however, are not binding on this Court.  *Staats v. Cty. of Sawyer*, 220 F.3d 511, 514 (7th Cir. 2000) (extending Supreme Court's holding regarding Title VII claims to ADA and Rehabilitation Act claims and explaining that claim preclusion does not apply to unreviewed state agency findings, including agency factfinding, in claims brought under the ADA or Rehabilitation Act); *Pernice v. City of Chicago*, 237 F.3d 783, 787 n. 5 (7th Cir. 2001) (holding the same).  The Court acknowledges that neither party raised claim preclusion as an affirmative defense, but also notes that the Seventh Circuit "ha[s] recognized that courts, in the interest of judicial economy, may raise the issue of preclusion *sua sponte* even when a party fails to do so.  *Kratville v. Runyon*, 90 F.3d 195, 198 (7th Cir. 1996).

[2]  Scheidler's performance reviews indicate that the title of her position was "Clerical Assistant."  *See* Dkt. No. 50-1.

[3]  Scheidler argues that Gunter was also her supervisor.  *See, e.g.*, Dkt. No. 49 at 7-8.  This issue is discussed in detail later.  *See infra* n. 13.

2

In 2009, Scheidler was diagnosed with depression, bipolar disorder, and post-traumatic stress disorder.  Dkt. No. 35 ¶ 51.  Sometime that same year, Scheidler took FMLA leave related to what she terms a "complete breakdown."  Dkt. No. 50-8 at 11.  When she returned from leave, she discussed her issues and medicines with Donovan and asked that if she noticed she was behaving differently, to "please pull me in and let me know so that I can have it addressed by either my doctor and/or my psychologist."  *Id.* at 12.  To other people that she worked with, she explained that she was "skittish" and "would tell them what I had, just so that they'd know."  *Id.* She requested the following from them: "not to startle me, speak, you know, not to raise your voice.  If I'm distracted, try to make your appearance – appearance well in advance."  *Id.*  She also indicated that others left her alone if she was having a difficult day.  *Id.*

Beginning in 2010, Scheidler car-pooled with Gunter and Ronda Ankney, Gunter's sister-in-law, who also worked for IDOI, for their two-hour round-trip commute.  *Id.* at 12; 47.  To accommodate the car pool, IDOI allowed Scheidler to change her schedule so that she worked the same hours as Gunter and Ankney, 7:00 a.m. to 3:00 p.m.  Dkt. No. 49 at 21 (citing Dkt. No. 50-8 at 12).

On the morning of May 28, 2013, Scheidler went to Gunter's office to ask about an email they both received in which Donovan redistributed the workload of an employee who had transferred to another department.  Dkt. No. 50-8 at 16.  Scheidler stated that she was there "to ask one of [her] bitch questions."  *Id.* at 32-33.  Getting the mail had been reassigned to a coworker who had previously refused to get the mail, so Scheidler wanted to know whether she was going to have to get the mail for the coworker, even though Donovan had told her not to do it when it was originally the coworker's responsibility.  *Id.* at 16.  Gunter responded that she did not know and that she only knew as much as Scheidler did.  *Id.*

3

Following the conversation, Gunter went to Ankney's cubicle, Dkt. No. 49 at 9, which was 30 to 40 feet from Gunter's office, Dkt. No. 50-8 at 41. Gunter was frustrated and said to Ankney, "I will not be surprised if I don't string her up by the end of the week." *Id.* at 40. Scheidler heard the comment as she came around the corner and asked Gunter, "Are you talking about me?" *Id.* at 16. Gunter also said, "I could just strangle you," and made a strangling gesture toward Scheidler. Dkt. No. 49 at 8. Gunter also told Scheidler that she was tired of her negativity and complaints about work. *Id.* at 11. Gunter then told Scheidler that she should quit and get another job. Dkt. No. 50-8 at 17. Scheidler responded, saying that Gunter already knew she had been applying for other positions and indicated that she had applied for many in order to "get out of here." *Id.* Then, Scheidler responded as follows:

> "You know as well as I do that you've been unhappy too. I've not had the same . . . opportunities . . . as you have to move out of a position that you was miserable with." And I said, "I know when you were [in the] medical mal[practice department], there were many days that you were crying on the way to work and you had to take Xanax. You were very upset."

Dkt. No. 50-8 at 33. Gunter told Scheidler she did not want to carpool anymore. *Id.* at 34. Gunter raised her voice during the encounter. *Id.* at 33.

After the encounter, Scheidler sent an email to Donovan telling her about the incident.[4] Dkt. No. 50-8 at 18. Donovan was out of the office at the time of the confrontation, but contacted Scheidler later that day. *Id.* at 16; 18, respectively. At the end of the day, Scheidler, Gunter, and Ankney carpooled home. Dkt. No. 49 at 13.

Donovan reported the incident to Katherine Dailey, Human Resources Director for a number of state agency divisions, including IDOI. Dkt. No. 50-8 at 19. Dailey interviewed Scheidler on June 14, 2013. Dkt. No. 50-2 at 7; *see also* Dkt. No. 50-8 at 53. Dailey noted that

---

[4] The contents of this email are not in the record before the Court.

"[Scheidler] said that she feels that she may be working in a hostile environment."  Dkt. No. 50-2 at 7.  Dailey asked the employee relations department in the State Personnel Department to conduct an investigation.  Dkt. No. 50-8 at 53.  The State Personnel Department is a state agency independent of IDOI.  Dkt. No. 49 at 13.  Jeff Hendrickson and Alan Ferguson conducted the investigation, interviewing Scheidler, Donovan, Gunter, and Ankney on July 3, 2013.  Dkt. Nos. 50-2 at 11; 50-8 at 50.  During the investigation, Hendrickson and Ferguson learned from Gunter that Scheidler made a comment to Ankney and her when they were in the elevator leaving work one day in March or April 2013.  Dkt. No. 50-8 at 43.  Scheidler complained of favoritism, *id.* at 16, saying, "[i]t's not what you know, it's who you blow,"  *id.* at 15.  Scheidler admitted making the comment.  Dkt. No. 50-8 at 15.  Hendrickson concluded that "'a higher level of professionalism should have been exercised by both'" Scheidler and Gunter.  Dkt. No. 49 at 17 (quoting Dkt. No. 50-8 at 50).  The State Personnel Department reported its findings to IDOI senior management.  *Id.* at 18.  Stephen Robertson, Commissioner of the Indiana Department of Insurance, issued letters to both Scheidler and Gunter on July 8, 2013, explaining the respective disciplinary actions being taken against them.  *See* Dkt. Nos. 50-3; 50-4.  Gunter received a written reprimand.  Dkt. No. 50-8 at 43.  Scheidler was terminated on July 8, 2013, "as a combined result of her behavior on May 28, 2013, as well as the earlier remark [in the elevator]."  *Id.* at 18.

Scheidler filed two charges of discrimination with the Equal Employment Opportunity Commission, one in August 2013, alleging religious and disability discrimination and retaliation, and another on November 9, 2013, alleging gender and disability discrimination and retaliation.  She received a right-to-sue letter regarding the August 2013 charge on March 10, 2014, and timely filed this lawsuit on June 6, 2014.  She received a right-to-sue letter relating to the

November 2013 charge on July 16, 2014, and timely filed an amended complaint on October 11, 2014.

### III.    DISCUSSION

The Court notes that Scheidler's complaint does not clearly state what claims she is asserting.  Scheidler clarifies in her brief in response to this motion that she is pursuing claims of disability discrimination, failure to accommodate, and retaliation for making complaints of sex and disability discrimination.  *See* Dkt. No. 49 at 6; 25.  Because it is also not entirely clear from Scheidler's filings, the Court determines that she brings her disability claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act and her retaliation claims under those statutes and Title VII of the Civil Rights Act of 1964, as amended.  She seeks only injunctive relief and no damages under the ADA.[5]  *See id.* at 24.  All claims are brought against the State of Indiana and Stephen W. Robertson, Commissioner of the Indiana Department of Insurance, in both his official and personal capacities.  The Defendants move for summary judgment with respect to all of Scheidler's claims.

### A.    Claims against Stephen W. Robertson

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted).  Therefore, the official capacity claims against Robertson add nothing to Scheidler's claims against the state itself.  Additionally, there is no individual liability for Robertson under the ADA or Rehabilitation Act because, as an individual, he does not meet the

---

[5] Although the Defendants did not raise immunity as a defense to Scheidler's ADA claims, they did correctly assert that Scheidler was barred from obtaining damages in relation to her ADA claims.

ADA's definition of "employer."[6]  *See, e.g.*, *Stanek v. St. Charles Comm. Unit Sch. Dist. No. 303*, 783 F.3d 634, 645 (7th Cir. 2015) (affirming lower court's dismissal of individual capacity discrimination and retaliation claims under the Rehabilitation Act and ADA); *U.S. EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, at 1282 (7th Cir. 1995) (holding that supervisor cannot be held liable in individual capacity under the ADA); *Silk v. City of Chicago*, 194 F. 3d 788, 797-98 n. 5 & n.6 (7th Cir. 1999) (same).  Accordingly, summary judgment is GRANTED with respect to all claims against Robertson.

### B.    Disability Discrimination under ADA and Rehabilitation Act

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The Rehabilitation Act similarly prohibits discrimination against a "qualified individual with a disability . . . solely by reason of her or his disability."  29 U.S.C. § 794(a).  Such causation language is unique to the Rehabilitation Act, which otherwise "incorporates the standards applicable to Title I of the ADA."  *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2015) (citing 29 U.S.C. § 794(d); 29 U.S.C. § 705(20)(B); *Silk*, 194 F.3d at 798 n. 7)).

---

[6]  Scheidler also did not name Robertson in her EEOC charges.  "[A] party not named as the respondent in the charge may not ordinarily be sued in a private civil action."  *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013) (regarding Title VII actions) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1089 (7th Cir. 2008)).  Seventh Circuit precedent allows an exception to this general rule where a plaintiff "allege[s] that [a defendant not named in the EEOC charge] had notice of the EEOC charge against it and an opportunity to participate in conciliation proceedings."  *Id.* at 666-67 (affirming dismissal of claims against defendant where plaintiff "did not add a single additional factual allegation pertinent to the [] exception in his amended complaint"); *see also Tamayo*, 526 F.3d at 1089 (affirming dismissal of claims against defendant where defendant had notice of a charge, but not that it had been filed against it rather than another entity).  Scheidler did not allege that Robertson had notice of a charge against him or that he had an opportunity to participate in conciliation proceedings.

To survive a motion for summary judgment on an ADA or Rehabilitation Act discrimination claim, a plaintiff must point to evidence that satisfies either the direct or indirect method.[7]  *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (ADA); *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002) (applying ADA standards in Rehabilitation Act context).[8]  Scheidler argues that she can satisfy either method.[9]  Dkt. No. 28 at 1.

To avoid summary judgment under the indirect method, Scheidler must establish that (1) she is disabled within the meaning of the applicable statute, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated, non-disabled employees more favorably.[10]  *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) (citing *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014)).  If a plaintiff establishes her *prima facie* case, the burden shifts to the employer to present a legitimate, non-discriminatory reason for the adverse employment action. *Bunn*, 753 F.3d at 685.  On such a showing, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination.  *Hooper*, 804 F.3d at 853.

---

[7]  In reviewing grants of summary judgment, the Seventh Circuit still uses this approach despite its recent questions regarding "the continued utility of the 'direct' and 'indirect' methods of proof in analyzing discrimination claims."  *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 789-90 (7th Cir. 2015) (in Title VII context).

[8]  The Rehabilitation Act requires Scheidler to show that her employer received federal financial assistance. *Jackson v. City of Chicago*, 414 F.3d 806, 810 n. 2 (7th Cir. 2005); *see also* 29 U.S.C. § 794(a).  While Scheidler has presented no evidence that her employer received federal financial assistance, the State has not contested the issue.  For purposes of this Entry, the Court assumes that Scheidler's employer received federal financial assistance.

[9]  For ease of reading, the Court will use "ADA" to refer to both the ADA and the Rehabilitation Act.

[10]  In line with recent questions regarding the utility of the direct and indirect method inquiries, the Seventh Circuit has also questioned whether the similarly situated element is necessary.  In certain instances, it has broadened the test, allowing a plaintiff to proceed without establishing this element.  *See Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 605 (7th Cir. 2014) (citing *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006)).

"The ultimate question . . . , and that which is relevant here, is 'whether a reasonable jury could find prohibited discrimination.'" *Id.* (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014)).  In that respect, at trial, "a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice."  *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010); *see also Carter v. Casa Cent.*, 849 F.2d 1048, 1054 (7th Cir. 1988) (in Rehabilitation Act context, applying the similar "solely because of" disability standard); *cf. Silk v. Bd. of Tr., Moraine Valley Cmty. Coll. Dist. No. 524* (*Moraine Valley Cmty. Coll.*), 795 F.3d 698, 705-06 (7th Cir. 2015) (remarking on, but not deciding "whether *Serwatka*'s rule applies post-[ADA Amendments Act] – i.e., whether the 'on the basis of' [a disability] language changes the [but-for] analysis").

It is undisputed that Scheidler's termination is an adverse employment action that satisfies the third element of the test.  The State argues, however, that Scheidler cannot satisfy the test's other elements.  The State denies that Scheidler was a qualified individual with a disability, arguing that she neither had a disability nor met its legitimate performance expectations.  It also argues that Scheidler has not identified a similarly situated non-disabled employee who was treated more favorably.

### 1. Disability

Under the ADA, disability is defined, in part, as "a physical or mental impairment that substantially limits one or more major life activities of such individual."[11]  42 U.S.C. § 12102(1)(A).  "[M]ajor life activities include, but are not limited to, caring for oneself,

---

[11]  Scheidler pursues her claims under this definition only and does not contend that the State discriminated against her for having a record of impairment or because it regarded her as having an impairment.

9

performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A).  They also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." § 12102(2)(B).

The State correctly notes that Scheidler did not name a disability in her complaint. However, it includes in its statement of material facts not in dispute that Scheidler was diagnosed with depression, bipolar disorder, and post-traumatic stress disorder ("PTSD") in 2009, which the Court accepts as true for purposes of this Entry.  *See* Dkt. No. 35 ¶ 51.  Scheidler asserts that these conditions limit her in the major life activities of "performing manual tasks, concentrating, thinking, communicating, and working" and that "her disabilities affect her major bodily functions of skeletal, digestive, bowel, bladder, neurological, brain, respiratory, endocrine, and reproductive functions."  Dkt. No. 49 at 26.  The State argues that Scheidler has not shown that her conditions substantially limit any major life activity.

The federal regulations implementing the equal employment provisions of the ADA Amendments Act of 2008 provide that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."  29 C.F.R. § 1630.2(j)(1)(i).  Although, perplexingly, neither party acknowledges this fact, the regulations further provide that "major depressive disorder, bipolar disorder, post-traumatic stress disorder . . . substantially limit brain function."  29 C.F.R. § 1630.2(j)(3)(iii).  Accordingly, there is no question that these conditions qualify as disabilities under the ADA, and

the Court need not consider whether Scheidler's conditions substantially limit any of the major life activities that she lists as impaired.

### 2.    *Legitimate Expectations and Similarly Situated Employees*

The State argues that Scheidler "was terminated from the IDOI as a result of her two instances of unprofessionalism": the favoritism comment in the elevator and participating in the May 28, 2013 exchange with Gunter.  Dkt. No. 35 at 20.  Scheidler does not dispute that she engaged in such conduct or that these were the reasons for her termination.  *See* Dkt. Nos. 50-8 at 15 & 33; 49 at 18, respectively.  Although it is far from clear from the briefing, the Court understands Scheidler to argue that she was either nonetheless meeting her employer's legitimate expectations (Scheidler had not received any discipline prior to her termination discipline, and her supervisor told her "she was doing an excellent job") or that other employees engaged in similar misconduct and were treated more favorably.  Dkt. No. 49 at 27; 28 & 29, respectively.

The State disputes that Scheidler has shown that she met IDOI's legitimate expectations, and the Court agrees.  Meeting legitimate expectations in the past "is irrelevant."  *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) (citing *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004)).  Moreover, "[a]n employer may fire an employee for engaging in unacceptable workplace behavior without violating the ADA (or the Rehabilitation Act), even if the behavior was precipitated by a mental illness."  *Brumfield*, 735 F.3d at 630-31; *see also Palmer v. Circuit Court of Cook Cty.*, 117 F.3d 351, 352 (7th Cir. 1997).  Absent a discriminatory motive, an employer would be justified in terminating an employee who engaged in the behavior to which Scheidler admits.

Such a finding, however, is not dispositive of Scheidler's *prima facie* case.  The legitimate expectation and similarly situated elements of the *prima facie* case "merge in cases of

discriminatory discipline; the inquiry [instead] is whether a [non-disabled employee] engaged in similar misconduct yet received lighter punishment." *Baker v. Macon Resources, Inc.*, 750 F.3d 674, 676 (7th Cir. 2014) (applied in age discrimination context) (citing *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011) (applying merged test in race discrimination context); *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011) (same)). "[W]hen uneven discipline is the basis for a claim of discrimination, the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Rodgers*, 657 F.3d at 518.

Though not so clearly stated in the briefing, the Court understands Scheidler to argue that Gunter is a similarly situated, non-disabled employee who engaged in comparable (or worse) misconduct but received a lighter punishment. *See* Dkt. No. 49 at 29. The State argues that Gunter is not similarly situated, nor did she engage in comparable misconduct because she "had an unblemished personnel record with no discipline and was punished by IDOI for only one occasion of inappropriate conduct – her part in the May 28, 2015 (sic) altercation."[12] Dkt. No. 53 at 8. They argue that, like Scheidler, she "suffered an adverse employment action," but the disciplinary action taken against Gunter was "not identical" because "[Scheidler] had participated in two unprofessional or offensive incidents as opposed to Gunter's one." Dkt. No. 35 at 19.

"'[P]recise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas*, an allegation that other employees involved in acts against

---

[12] The Court notes that the State makes this argument in the context of Scheidler's failure-to-accommodate claim. Given the disorganized nature of Scheidler's briefing and the ambiguous nature of her arguments, the Court does not fault the State for not making it with regard to this claim as well.

[the employer] of comparable seriousness' received more favorable treatment 'is adequate to plead an inferential case' of discrimination." *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012) (quoting *McDonald v. Santa Fe Trail Trans. Co.*, 427 U.S. 273, 283 n. 11 (1976)); *see also Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) ("[I]n deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness."). "Comparable seriousness may be shown by pointing to a violation of the same company rule or to conduct of similar nature." *Peirick*, 510 F.3d at 689 (internal citations omitted).

The analysis is straightforward. Gunter and Scheidler worked in the same department, reported to the same supervisor, and were subjected to the same standards of conduct.[13] They both participated in the May 28, 2013 incident at Ankney's cubicle. Regarding that incident, the State Personnel Department concluded that "'a higher level of professionalism should have been exercised by both'" employees. Dkt. No. 49 at 17 (quoting Dkt. No. 50-8 at 50). Gunter and Scheidler were also disciplined on the same day by the same decisionmaker, and the disciplinary action letters issued to them both said the same thing: "Your inappropriate conduct does not meet agency standards and is unacceptable. That is the reason for this disciplinary action." *See* Dkt.

---

[13] Contrary to Scheidler's contention in her response brief, Gunter was not Scheidler's supervisor. She was only responsible for assigning and supervising Scheidler's work, but had no power to directly affect the terms and conditions of Scheidler's employment. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (defining supervisory authority as "primarily consist[ing] of the power to hire, fire, demote, promote, transfer or discipline an employee") (overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013)). Mere "authority to oversee aspects of another employee's job performance" is insufficient. *See Rhodes v. Ill. Dep't. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (citing *Hall*, 276 F.3d at 355). Additionally, Scheidler's own testimony indicates that she did not consider Gunter to be her supervisor: "[S]he transferred down into my division, financial services, as a supervisor. But I don't know what she supervised." Dkt. No. 50-8 at 14. And, when asked by the ALJ "She didn't supervise you?" Scheidler responded, "She supervised no one." *Id.*

Nos. 50-3; 50-4.  Gunter received a written reprimand, while Scheidler was terminated.  *See* Dkt. Nos. 50-3; 50-4, respectively.

The State contends that the difference in the severity of discipline is due to Scheidler's additional inappropriate comment in March or April 2013 regarding favoritism: "It's not what you know, it's who you blow."  Dkt. No. 35 at 19.  As a result of this added fact, they argue, Gunter and Scheidler did not engage in identical conduct.  *Id.*  Scheidler's comment is nonetheless in the same vein as the inappropriate conduct both employees engaged in on May 28, 2013.  Even including the March or April 2013 elevator statement, Scheidler's conduct, on the whole, remained similar to, rather than more extreme or severe than, Gunter's conduct. Comparators need only "'engage[] in similar – not identical – conduct to qualify as similarly situated.'"  *Peirick*, 510 F.3d at 691, 689 (quoting *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005).  As a result, Scheidler has produced evidence sufficient to raise an inference that a reasonable jury could find that Gunter is a comparable employee who engaged in similar misconduct yet received more favorable treatment.[14]  With this Scheidler has established, however tenuously, a *prima facie* case of discrimination.

---

[14]  The Court again notes that Scheidler spent a fair amount of time in her response brief asserting that Gunter was her supervisor as well as her coworker.  The Court presumes Scheidler made this argument in an attempt to invoke, under a hostile work environment theory, strict liability for discriminatory acts perpetrated by Gunter.  Where an employee is harassed by her supervisor and "the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable" for the conduct of the supervisor.  *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013); *see also Rhodes*, 359 F.3d at 505 ("Harassment by a supervisor of the plaintiff triggers strict liability").  This theory of strict vicarious liability, however, is only relevant in the context of a hostile work environment claim.  *See Silk*, 194 F.3d at 803-05 (recognizing strict liability and assuming, but not deciding, that a hostile work environment claim is cognizable under the ADA).  It is therefore inapplicable here, as Scheidler has abandoned any hostile work environment claim she may have alleged.  *See* Dkt. No. 49 at 6; 25.

### 3. Legitimate, Non-Discriminatory Reason and Pretext

Under the indirect method analysis, the burden now shifts to the State to present a legitimate, non-discriminatory reason for Scheidler's termination. *Bunn*, 753 F.3d at 685. As already noted, the State has offered a legitimate, non-discriminatory reason for Scheidler's termination – that Scheidler was terminated for engaging in two instances of inappropriate conduct – and Scheidler does not dispute that she engaged in such conduct.

The burden then shifts back to Scheidler to show that the State's proffered reason is a pretext for discrimination. *Hooper*, 804 F.3d at 853. A pretextual decision "'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). The Court must evaluate "'whether the employer honestly believed the reason it has offered to explain the discharge.'" *Id.* (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)); *see also Burks v. Wisconsin Dep't. of Transp.*, 464 F.3d 744, 754 (7th Cir. 2006). "To demonstrate a material issue of fact as to pretext, [a plaintiff] must show that 'either 1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible.'" *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)). "To meet this burden, [Scheidler] must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [the State's] asserted reason 'that a reasonable person could find it unworthy of credence.'" *Coleman*, 667 F.3d at 852 (quoting *Boumehdi v Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). On the other hand, if a reasonable fact finder would be compelled to

believe the State's explanation, then the State is entitled to summary judgment.  *Argyropoulos*, 539 F.3d at 736 (citation omitted).

Scheidler presents several circumstances that arguably point to pretext.  As in the similarly-situated inquiry, she contends that the fact that Gunter received a written reprimand instead of termination for essentially the same misconduct shows that the State selectively enforced its progressive discipline policy.  *See, e.g.*, *Coleman*, 667 F.3d at 857 ("[S]elective enforcement of a rule 'calls into question the veracity of the employer's explanation.'") (quoting *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001)); *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) ("Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent.").

Scheidler also raises concerns about the circumstances surrounding how the March or April 2013 statement was reported to IDOI: that is, that Gunter, the person about whom Scheidler complained, brought the comment to IDOI's attention during the course of the State Personnel Department's investigation into the May 28, 2013 incident.  *See, e.g., Coleman*, 667 F.3d at 853 (background facts related to how employer learned of employee threat cast doubt on employer's honest belief in reason for termination, that employee posed a credible threat).

Furthermore, Scheidler calls into question IDOI's assertion that it "previously terminated [non-disabled] employees for single incidences of offensive, unprofessional conduct and, specifically, inappropriate language": "Donna Thomas, a non-disabled employee, was dismissed in 2011 for using the word 'nigger' in the workplace on a single occasion."  Dkt. No. 49 at 19. She points to evidence in the record that shows that that action "'in combination with [Thomas's]

history of discipline and work performance'" was the reason for her termination.  *See id.*

(quoting Dkt. No. 50-16).

Combined, these inconsistencies present a genuine issue of material fact as to whether

IDOI's stated reason for terminating Scheidler was pretextual.  *Coleman*, 667 F.3d at 853

(holding combination of several pieces of evidence sufficient to defeat summary judgment on the

pretext issue).[15]  Therefore, the Court denies the Defendants' motion for summary judgment with

regard to Scheidler's disability discrimination claims under the ADA and Rehabilitation Act

against the state.

## C.    Retaliation

Scheidler also argues that she was terminated in retaliation for engaging in protected

activity.  She claims the State retaliated against her by terminating her in response to her

complaints of sex and disability discrimination.  Dkt. No. 49 at 6; 25; 29.

Title VII, the ADA, and the Rehabilitation Act prohibit employers from retaliating

against employees who exercise their rights under those statutes.  *See Moraine Valley Cmty.*

*Coll.*, 795 F.3d at 710 (retaliation under ADA); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687

(7th Cir. 2010) (retaliation under Title VII); *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir.

2012) (retaliation under Rehabilitation Act).  Like discrimination claims, retaliation claims

proceed under the direct or indirect methods of proof.  *Turner*, 595 F.3d at 690 (discussing the

approach to ADA and Title VII claims); *Anderson*, 699 F.3d at 994-95 (same regarding claims

under the Rehabilitation Act).  To establish a *prima facie* case under either the direct or indirect

---

[15]  The Court need not examine Scheidler's disability claims under the direct method as
Scheidler has satisfied the indirect method.  *Id.* at 845 (deciding no need to evaluate claims under
direct method where plaintiff presented sufficient evidence under the indirect method to survive
summary judgment).

method, the employee must, as a first element, establish that she engaged in a statutorily

protected activity. *Moraine Valley Cmty. Coll.*, 795 F.3d at 710 (applying factor in ADA and

ADEA retaliation contexts); *Turner*, 595 F.3d at 687-88 (applying factor in Title VII and ADA

contexts); *see also Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008) (applying same factor in

Rehabilitation Act context).

### 1.  Retaliation in Violation of Title VII

Scheidler characterizes her "It's not what you know, but who you blow" comment as a

complaint of sex discrimination. *See* Dkt. No. 49 at 15 ("[Scheidler] also complained that a less

qualified female had been promoted over [Scheidler][16] and that [Scheidler] had told Gunter and

Ankney three months earlier something to the effect that it is who you know or who you blow. . .

. Instead of investigating the complaint of sex discrimination, the State retaliated against

[Scheidler] for making the complaint.").  She maintains that she was terminated in response to

making this complaint.[17]

Regardless of which method of proof Scheidler uses to pursue her retaliation claim, she

must first demonstrate that she engaged in statutorily protected activity.  To constitute protected

activity, "[t]he plaintiff must not only have a subjective (sincere, good faith) belief that [s]he

opposed an unlawful practice; h[er] belief must also be objectively reasonable, which means that

the complaint must involve discrimination that is prohibited by Title VII." *Hamner v. St. Vincent

Hosp. and Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000).  Scheidler's claim fails in

---

[16]  There is no evidentiary support in the record indicating that, at the time of Scheidler's elevator comment, the employee to which Scheidler referred had been promoted or that Scheidler complained that a less qualified female had been promoted over her.

[17]  Scheidler also referred to complaints she made in 2011 against a co-worker's sexual statements, Dkt. No. 50-8 at 19, but she does not argue that these form the basis for her retaliation claim, and has thus abandoned that argument. *See* Dkt. No. 49 at 24.

both respects: she did not have a sincere, good-faith belief that she was opposing an unlawful practice; nor did her complaint involve discrimination that is prohibited by Title VII.[18]  Again, Scheidler said, "It's not what you know, but who you blow."  Because a comment could be interpreted to involve a sexual act does not make it a complaint of sex discrimination or harassment:  "[A] 'complaint must indicate the discrimination occurred because of sex . . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.'"  *Orton-Bell v. Indiana*, 759 F.3d 768, 776 (7th Cir. 2014) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)).  Scheidler "has not provided any evidence that she rooted her [statement] in the fact that she was a woman-which is what is required."  *Orton-Bell*, 759 F.3d at 776.  Because Scheidler did not engage in protected activity when she made her statement, she has failed to establish an essential element of her Title VII retaliation claim under both the direct and indirect methods.  Therefore, the Court grants the Defendants' motion for summary judgment with regard to Scheidler's Title VII retaliation claim.

---

[18]  Scheidler herself testified that she did not believe her comment was sexual in nature:

Question:   "And are you making a statement that you didn't think that was a sexual connotation?"

 Answer:    "It was not to me, no more than Ms. Gunter saying, "I have PMS."

. . .

Question:   "What do you think that that means then?  I mean, if you don't think that --"

Answer:    "Blowing hot air, you know.  There's -- that's what I was taking it as.  [Gunter and Ankney] construed it as sexual comment.  And so I refrained from ever saying it to them again."

Dkt. No. 50-8 at 34.

2.       *Retaliation in Violation of ADA and Rehabilitation Act*

Scheidler also argues that she was terminated in retaliation for complaining of disability discrimination.  Dkt. No. 49 at 6; 25; 29.  Scheidler does not clearly articulate what her complaint of disability discrimination was in any of her filings.  Scheidler alleged in her second amended complaint that she "complained to [IDOI] and to the State Personnel Department about the hostile work environment."  Comp. ¶ 27.  In her statement of claims, she stated vaguely that she "complained about discrimination in May of 2013," Dkt. No. 28 at 2-3, and, in referring to the May 28, 2013 incident with Gunter, "complained about the harassment to [IDOI] and to the State Personnel Department," *id.* at 3.  In her response to the Defendants' motion, she repeatedly refers to her complaint of Gunter threatening to strangle her as her protected activity.  Dkt. No. 49 at 3 ("[She] complained about the disability discrimination by Gunter's threat to strangle [her]"); *id.* at 18 ("The Defendants retaliated against [Scheidler] for her complaints about Gunter"); *id.* at 29 ("[Scheidler] had no discipline in the several years of her employment with IDOI until she complained about Gunter's threat to strangle her").  Scheidler does not, however, invoke a protected characteristic in any of these complaints.

The closest Scheidler gets to articulating a complaint of disability discrimination follows: "When [Scheidler] complained to human resources about Annette Gunter threatening her and making a strangling motion at [her], she told human resources that she suffered from bipolar disorder and PTSD and that is why the situation startled and upset her more than it might other people."  Dkt. No. 49 at 27 (citing Dkt. No. 50-8 at 19 ("And I also told [the State Personnel Department] in that conversation that when I was describing what Ms. Gunter did to me that I did – I was bipolar.  I was PTSD, that when you're bipolar and someone does gestures to you like that, it does startle you and upset you more than might the general [population].")).  Here,

Scheidler raises her conditions only to explain why she reacted to Gunter the way she did, not to complain that she was discriminated against *because of* her disability.  Again, "'[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.'"  *Orton-Bell*, 759 F.3d at 776 (quoting *Tomanovich*, 457 F.3d at 663).  Scheidler again has not shown that she engaged in statutorily protected activity, nor has she created that inference.  *See Tomanovich*, 457 F.3d at 663-64 (listing cases holding plaintiff did not engage in protected activity where complaints failed to indicate connection to protected class); see also *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (affirming grant of summary judgment for defendant where complaints did not include objections to discrimination based on protected category).  Thus, Scheidler's ADA and Rehabilitation Act retaliation claims under both the direct and indirect methods of proof are doomed, and the Court grants summary judgment to the State with regard to Scheidler's retaliation claims under the ADA and Rehabilitation Act.

### D.    Failure to Accommodate

Finally, Scheidler claims that the State failed to accommodate her disability.  Specifically, Scheidler contends that the State failed to accommodate her in two respects: (1) "by terminating [her]" because it "did not respect the accommodations that [she] had requested of her supervisors and fellow employees," Dkt. No. 49 at 27-28; and (2) "by not having an alternative form of punishment available to [her] for the incident on May 28, 2013 since Gunter's actions affected [her] disability, which in turn affected [her] response," *id.* at 28.[19]  To clarify, Scheidler

---

[19]  Scheidler does not dispute that she was provided all requested accommodations prior to her involvement in the May 28, 2013 incident and her subsequent termination.  Viewing the facts in the light most favorable to Scheidler, she had previously requested the following accommodations: if Donovan noticed different behavior to "please pull me in and let me know so that I can have it addressed by either my doctor and/or my psychologist," Dkt. No. 50-8 at 12;

added that "[t]he Defendants did not give [Scheidler] treatment equal to Gunter and Ms. Thomas, let alone provide her any accommodation[.]" *Id.* at 28.

There are two distinct categories of disability claims, those for failure to accommodate and those for disparate treatment. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). With regard to the former, an employer violates the ADA when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A). In this case, Scheidler's failure-to-accommodate claim is simply her disparate treatment claim worded another way: the accommodation she seeks that the State failed to provide was "treatment equal to Gunter." Dkt. No. 49 at 28. Because Scheidler does not allege a cognizable failure-to-accommodate claim separate from her disparate treatment claim, the Court grants the State summary judgment with respect to Scheidler's failure-to-accommodate claim.

## IV.   CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Specifically, the Court **GRANTS** summary judgment in favor of Defendant Robertson on all of Scheidler's claims. It also **GRANTS** summary judgment in favor of the State on Scheidler's retaliation and failure-to-accommodate

---

and to other people that she worked with, she explained that she was "skittish" and requested the following from them: "not to startle me, speak, you know, not to raise your voice. If I'm distracted, try to make your appearance – appearance well in advance." *Id.* She also indicated that everyone knew to leave her alone if they knew she was having a difficult day. *Id.* She received those accommodations and was also granted FMLA leave in 2009. In addition, "[Scheidler]'s supervisor worked with [her] to keep an eye on her disability and met with [her] to discuss if there were any changes in her behavior." Dkt. No. 49 at 27 (citing Dkt. No. 50-8 at 12). Thus, her failure-to-accommodate claim is based entirely upon the State's treatment of her following the May 28, 2013 incident.

claims.  Summary judgment is **DENIED** with regard to Scheidler's claims against the State for disability discrimination under the ADA and Rehabilitation Act.


      SO ORDERED: 3/17/16


                                    Hon. William T. Lawrence, Judge
                                    United States District Court
                                    Southern District of Indiana


Copies to all counsel of record via electronic notification